IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DONOVAN FLUHARTY,

      Plaintiff,

v.                                           Civil Action No. 5:08CV70
                                          (Judge Stamp)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Summary Judgment, or in the Alternative Remand and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Donovan Fluharty ("Plaintiff") filed applications for DIB and SSI on December 2, 2005, originally alleging disability beginning October 17, 2005 (R. 11). As a threshold matter, the Social Security Administration ("SSA") denied Plaintiff's application for SSI on December 15, 2008, due to his having excess income from pensions (R. 179). There is no dispute regarding the SSI denial due to excess income. This case is therefore proceeding before the Court solely on the DIB claim.

In order to prevail on the DIB application, Defendant would have to show he was disabled on or before his Date Last Insured ("DLI"), December 31, 2002. Plaintiff's application was denied initially and on reconsideration (R. 11). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Paul Sacks held on May 15, 2007 (R. 187). Plaintiff, represented by counsel, was present and testified, as did Vocational Expert Noel Plummer ("VE") (R. 70). On September 27, 2007, the ALJ issued an unfavorable decision (R. 11). The Appeals Council denied Plaintiff's request for review (R. 4), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Donovan Fluharty ("Plaintiff") was born on January 27, 1947, and was 50 years old when he stopped working (retired) in 1997, when his job was eliminated; 55 years old on his Date Last Insured December 2002; and 60 years old at the time of the administrative hearing (R. 41). He graduated from high school and had an additional four years of electrical training provided by his employer (R. 198). Plaintiff has past relevant work as a motor inspector and repair person in the electrical department for Weirton Steel (R. 215-216). The VE classified this past work as medium in terms of exertional level and skilled, with an SVP (Specific Vocational Training) level of seven or eight.[1] He left that job in 1997, when Weirton Steel was restructuring, which he stated would

---

[1]SVP is defined as:

> the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

The Revised Handbook for Analyzing Jobs (U.S. Department of Labor, 1991b). An SVP of 7 is for over 2 years up to and including 4 years; an SVP of 8 is for over 4 years up to and including 10 years. Id. See also http://www.onetcenter.org

2

have required him to perform a much more labor intensive job.[2]

In his original applications for SSI and DIB, Plaintiff stated his disability began on October 17, 2005, which is the date he had his heart attack (R. 41). He also reported private retirement pensions of $1,158.12 monthly from Weirton Steel and $309.95 monthly from National Steel (R. 42). As already noted, Plaintiff's claim for SSI was denied due to excess income from these pensions.

Plaintiff must show he was disabled on or before his Date Last Insured of December 31, 2002, in order to receive DIB. 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.01.

Defendant left his job with Weirton Steel in 1997, when it was going through reorganization/restructuring. He was 50 years old, and had worked there for 31 years. He began receiving a pension at that time.

On November 4, 1999, Plaintiff presented to his doctor, Atul Shetty, for a fungal rash (R. 84).

---

[2]On May 26, 2006, under "Work Background" Plaintiff wrote:

I worked for Weirton Steel from April 21, 1967 to September 30, 1997. My job was <u>done away with</u> and I was retired.

(R. 53) (Emphasis in original).

In September, 2006, Plaintiff submitted a "Recent Medical Treatment" form(R. 63). Under "Work Background," he stated:
Job eliminated at Weirton Steel Sept, 30, 1997. Been trying to live off pension until bankrupt steel mill!!
(R. 65).

Later in 2006, Plaintiff filled out another "Work Background" form, in which he wrote: <u>Retired.</u> Job eliminated at Weirton Steel September 30 1997. Trying to live off pension.

(R. 68)(Emphasis in original).

3

He had no other reported complaints at the time.

On September 20, 2000, Plaintiff presented to Dr. Shetty for an examination in order to get a CDL license and for some blood work (R. 83). He said he was "doing well." He had no chest pain or shortness of breath, but had a family history of coronary artery disease, diabetes, and aneurysm, and was concerned. He was diagnosed at that time with hypertension, on Zestril and Dyazide. His blood pressure was 120/86. He was also diagnosed with high cholesterol on Pravacol. Blood tests were ordered.

Plaintiff returned for follow up of his blood work on September 26, 2000 (R. 82). The results did show high blood sugar. He was started on Glucovance, and sent for a diabetic education class.

On October 9, 2000, Plaintiff presented to Dr. Shetty complaining of hypoglycemic episodes for the past couple of weeks (R. 81). He had been started on Glucovance, but had been having problems with it "and felt like when he skipped his meals that he was getting hypoglycemic." He had been well otherwise. The doctor stated:

> He has been doing fine. He was more worried than anything else. When he ate, he felt fine. He is also getting up once in a while at night to eat. We had a long discussion at this time, over 20 minutes with him and his girlfriend.

Dr. Shetty gave him a prescription for a glucometer to check his blood sugar levels, and cut his dosage of Glucovance.

Three months later, on January 9, 2001, Plaintiff presented to Dr. Shetty for follow up of his high blood pressure, high cholesterol, and diabetes (R. 80). Plaintiff said he felt good. He said the medications were helping, but he still had times in which his sugars went down, with a little dizziness, and a funny feeling with jitteriness. When he ate, it went away. He was otherwise well with no complaints, other than some tingling in his hands and feet. Dr. Shetty again diagnosed

diabetes, and advised Plaintiff to spread out his meals so he did not go into hypoglycemia, opining that "[o]nce he eats properly, he should do well." As to his high cholesterol, Dr. Shetty noted that Plaintiff said "his diet has not been good for the past couple months due to the holiday season."

Plaintiff next presented to Dr. Shetty on April 9, 2001, with no complaints except for tingling in both feet once in a while (R. 79). Dr. Shetty noted his sugar and cholesterol levels, and opined that he was "doing very well." Plaintiff continued to have no chest pain, shortness of breath, nausea, vomiting, fever, etc. The doctor added neuritis to his diagnoses, and stated that if it got worse, he would consider starting him on medication for that.

By his next appointment on July 9, 2001, Plaintiff said the neuritis-type problem had gotten somewhat better, but he was still having some numbness and tingling once in a while. He was otherwise well with no complaints. He continued to have no chest pain, shortness of breath, etc. the doctor added Elavil for the complaints of tingling.

On October 8, 2001, Plaintiff presented to Dr. Shetty for a regular check up (R. 77). He was doing well with no complaints. He did complain that the Elavil made him sick, without helping his symptoms. The doctor cut his Elavil dosage in half.

Seven months later, in May 2002, Plaintiff presented to Dr. Shetty for his regular check up (R. 76). He had been doing "very well." He had no complaints except for some chest cold, cough, and nasal stuffiness. Upon physical exam, Dr. Shetty found him to be doing very well. His sugars were stable on medication.

On August 5, 2002, Plaintiff presented to Dr. Shetty for a regular check up (R. 75). He was doing well with no complaints except for allergies which he thought were due to air conditioning. He said he was usually fine except in summer.

On November 1, 2002, Plaintiff presented to Dr. Shetty for his regular check up (R. 74). His cholesterol and sugars had both gone up. Plaintiff explained that he "ha[d] not been very good over the past holiday." He still had no chest pain, shortness of breath, etc. He still had some sinus problems. Plaintiff promised the doctor that he would not have to adjust his medications - - that he would work harder to lower his sugar and cholesterol. The reduced dosage of elavil was helping his neuritis. He complained it made him drowsy, but the doctor explained he was supposed to be taking it at night, not in the daytime. He also complained of erectile dysfunction, for which the doctor gave him some Viagra samples. The doctor also prescribed Zyrtec for his allergies. He prescribed a nasal spray and told Plaintiff to stop using the Afrin spray he had been using.

On December 6, 2002, his last visit with Dr. Shetty before his date last insured, Plaintiff said the Zyrtec was helping his allergies, but the nasal spray was not helping, "mainly because he is still using the Afrin nasal spray even though I have told him not to" (R. 73). Upon physical examination, the doctor found Plaintiff's weight and blood pressure high, but the rest of the exam was within normal limits.

As already noted, Plaintiff would need to show he was disabled on or before December 31, 2002.

There is no dispute that Plaintiff suffered a heart attack on October 17, 2005, and underwent a quintuple bypass. There is further no dispute that he underwent a second bypass surgery (quadruple) in January 2006. The relevant date in this case is December 31, 2002, years earlier. Nevertheless, the undersigned will discuss several reports in the record from 2005 as background.

On February 2, 2005, Plaintiff presented to Dr. Shetty for follow up of his blood work (R. 142). He was doing well, with no complaints. He had no chest pain or shortness of breath. Dr.

Shetty noted Plaintiff's sugars were still "a little high" and he would like to get them down. Plaintiff explained, however, that in the summer time he did a little bit more exercise and ambulated more and his sugars were lower. The doctor proposed that there might be a need for increased medication in the winter and less in the summer, but would wait until his next checkup in the spring to decide.

On March 2, 2005, Plaintiff complained of pain in his right upper quadrant. The doctor questioned possible gall bladder. Plaintiff stated he had had the problem for over one year.

On March 10, 2005, Plaintiff was doing well, with "a little bit of discomfort."

On August 8, 2005, Plaintiff complained that arthritis in his neck was "causing pain and numbness now!" (R. 141).

Plaintiff suffered a heart attack in October 17, 2005, and subsequently underwent two heart bypass operations. October 17, 2005 was Plaintiff's original alleged onset date.

On November 4, 2005, Plaintiff presented to Dr. Shetty for follow up (R. 140). He was post bypass, but was mainly following up his diabetes. Otherwise he had no problems.

On January 18, 2006, Plaintiff complained to Dr. Shetty of a lot of shortness of breath and chest pain, especially when he exerted himself (R. 139). Dr. Shetty scheduled a stress test. He opined that Plaintiff's sugar levels were doing well.

On March 20, 2006, Plaintiff requested Dr. Shetty complete disability papers for him (R. 138). Dr. Shetty opined: "As far as Mr. Donovan's cardiac status is concerned at this time, he is very much disabled. He is on multiple medications, as stated. Has just recently had a second bypass."

Dr. Shetty wrote a letter in response to a request by counsel, on March 20, 2006 (R. 133). Dr. Shetty noted that he was stating an opinion regarding Plaintiff's condition as of December 31, 2002, as requested. Dr. Shetty wrote:

As far as your questions are concerned, he was at that time, doing OK as far as his health was concerned. He did have diabetes and hypercholesterolemia, which does result in what happened to him now, which is his coronary artery bypass surgery times two. In the meantime, as far as December, 02 is concerned in answering the physical residual functional capacity for that time, if you look at my notes, he was in good shape at that time. As far as his impairment, he did not have any. As of now, he is positive for all employment. He can barely function in every day life. He cannot take care of himself, and basically needs someone else to take care of him, making sure that he is disabled and could use Social Security disability at this time.

On May 3, 2007, Dr. Shetty inexplicably wrote a second letter to Plaintiff's counsel, stating:

As far as your questions are concerned, he was at that time, doing OK as far as his health was concerned but I would limit his physical capabilities to no more than light work, or exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: the constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

As of now, he is positive for all employment. He can barely function in every day life. He cannot take care of himself, and basically needs someone else to take care of him, making sure that he is disabled and could use Social Security disability at this time.

At the administrative hearing held in May 2007, the VE testified that Plaintiff's past work as a motor inspector/repairperson in the electrical department would be classified as at the medium exertional level and would be considered skilled, with an SVP of 7 or 8 (R. 216). The skills would be transferable to jobs at lesser exertional levels, even down to light and sedentary levels.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant met the insured status requirements of the social Security Act through December 31, 2002.

2. The claimant has not engaged in substantial gainful activity since December 31, 2002, the alleged onset date (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq*)).

3. On or before his date last insured, the claimant had the following medically determinable impairments: hypertension and diabetes mellitus (20 CFR §§ 404.1520(c)and 416.920(c)).

4. On or before his date last insured, the claimant did not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR §§ 404.1521 and 416.921).

5. The claimant was not been [sic] under a disability, as defined in the Social Security Act, at any time on or prior to December 31, 2002, his date last insured (20 CFR §§ 404.1520(c) and 416.920(c)).

6. The claimant's countable excess income precludes Supplemental Security income eligibility.

(R. 11-19).

## IV. Contentions

A. Plaintiff contends substantial evidence does not support the Administrative Law Judge's conclusion that he was not disabled on or before December 31, 2002 because:

1. The evidence "reflect[s] that on or before December 31, 2002, his date last insured: (1) the plaintiff had a 'severe' impairment; and (2) that he was not capable of performing any more than a range of light work from a physical standpoint."

2. The second factor upon which this case hinges is the lack of any work-up by the Commissioner nor assessment of physical limitations by a State Agency physician.

9

3. Grid Rule 202.06 directs a finding of disability in this case.

4. The ALJ failed to consider CFR 404.1562, the "worn out worker exception," before deciding the merits of the claim, despite being directed to by Plaintiff's counsel post-hearing.

B. Defendant contends substantial evidence supports the ALJ's finding that Plaintiff could perform his past relevant work because:

1. The ALJ properly determined that Plaintiff did not demonstrate a severe impairment prior to his date last insured.

2. A social security claimant has the burden of furnishing medical evidence of his disability.

3. Plaintiff's argument that the grid rules direct a finding of disability in this case is without basis. Plaintiff incorrectly argues that his past work was unskilled or semi-skilled and, therefore, he relies on the wrong grid rule.

4. Plaintiff's reliance on the "worn out worker exception" is obviously misplaced.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.

1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Decision Regarding SSI Benefits

As a threshold matter, the ALJ found that Plaintiff continued to have unearned income in excess of that permitted for SSI benefits. Plaintiff does not dispute this finding, and the undersigned finds substantial evidence supports the ALJ's finding in this regard.

### C. Lack of Evidence from Commissioner

Plaintiff argues that, if the issue of disability on or before his date last insured is not decided totally in his favor, his claim should be remanded to the Commissioner because all the evidence in the file came from Plaintiff, not from the Commissioner. The reason, however, that the Commissioner did not seek other evidence, including, as Plaintiff suggests, State agency physician opinions, is simple and undisputed: 1) Because Plaintiff's unearned income was too high for SSI, there was no need for the Commissioner to obtain medical evidence for that claim; and 2) Plaintiff himself stated his alleged onset date to be October 17, 2005, when he had his heart attack. His DIB claim was therefore also denied at the Administrative level due to his onset date being nearly three years after his Date Last Insured. Again, the Commissioner therefore had no need to obtain any medical evidence himself. Plaintiff amended his onset date to December 31, 2002, his Date Last Insured, only shortly before the Administrative Hearing was held. Therefore the earlier denials were not based on medical evidence.

11

Under the regulations, an ALJ must consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past work, and (5) if not, whether he retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See 20 C.F.R. §§ 404.1520, 416.920. <u>The claimant bears the burden of production and proof during the first four steps of the inquiry</u>. See <u>Hunter v. Sullivan,</u> 993 F.2d 31, 35 (4th Cir.1992) (per curiam) (emphasis added). If the claimant can carry his burden through the fourth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant can perform despite his condition. See <u>id.</u> Therefore Plaintiff bears the burden of proving he was disabled on or before his DLI of December 31, 2002.

The Notice of Hearing dated April 9, 2007, states, in pertinent part:

**You May Submit Additional Evidence and Review Your File**

If there is more evidence you want to submit, get it to me right away. If you cannot get the evidence to me before the hearing, bring it to the hearing. If you want to see your file before the date of the hearing, call this office.

(R. 22). Plaintiff did not request any further evidence be obtained and did not object to the evidence that had been submitted at the hearing.

The undersigned United States Magistrate Judge does not find this situation requires remand, as long as the evidence before the ALJ was sufficient for him to make a determination of whether Plaintiff was disabled on or before his date last insured. In this case, the undersigned also finds the evidence before the ALJ was sufficient for him to make such a determination. Plaintiff's Alternative Motion for Remand should therefore be **DENIED**.

## D. Grid Rule 202.06

Plaintiff next argues that Grid Rule 202.06 directs a finding of disability in this case. Defendant contends that Plaintiff's argument that the grid rules direct a finding of disability in this case is without basis. The undersigned agrees. Plaintiff begins with a faulty premise – that his vocational profile mandates he be awarded benefits. Plaintiff explains that he was 55 years old on his date last insured, and correctly notes he would therefore be considered "advanced age 55-59." He is also a high school graduate with additional electrical training, and correctly notes he would be considered "high school graduate or more - - does not provide for direct entry into skilled work." Plaintiff incorrectly contends, however, that his past relevant work was at the "medium to heavy" exertional level, and unskilled or semi-skilled. He also incorrectly contends that there would be no transferability of skills to light or sedentary occupations.

According to the VE's testimony, however, Plaintiff's job as an electrical motor inspector /repairman would be at the medium exertional level and skilled (in fact, with a quite high SVP of 7 or 8) (R. 216). He also testified that Plaintiff's knowledge of electricity and motor repair would be transferable to jobs at the light and even sedentary levels. Therefore, even if Plaintiff was limited to "light" exertional work, as he contends, he would not meet the findings for disability under the grid. The evidence does not place Plaintiff at 202.06, but instead at 202.07, with a finding of "not disabled" under the grids.

Substantial evidence supports the ALJ's determination that Plaintiff would not be disabled under the Grids, even if he was limited to light level work.

## E. CFR 404.1562, the "Worn Out Worker Exception"

Plaintiff next argues that the ALJ failed to consider CFR 404.1562, the "worn out worker

exception" before deciding the merits of the claim, despite being directed to by Plaintiff's counsel post hearing. Plaintiff is mistaken, however. §404.1562 provides:

> (a) If you have done only arduous unskilled physical labor. If you have no more than a marginal education . . . and work experience of 35 years or more during which you did only arduous unskilled physical labor, and you are not working and are no longer able to do this kind of work because of a severe impairment(s) . . .we will consider you unable to do lighter work, and therefore, disabled.
>
> Example to paragraph (a): B is a 58-year-old miner's helper with a fourth grade education who has a lifelong history of unskilled arduous physical labor. B says that he is disabled because of arthritis of the spine, hips, and knees, and other impairments. Medical evidence shows a "severe" combination of impairments that prevents B from performing his past relevant work  Under these circumstances, we will find that B is disabled.
>
> (B) If you are at least 55 years old, have no more than a limited education, and have no past relevant work experience. If you have a severe, medically determinable impairment(s) . . . are of advanced age (age 55 or older . . .), have a limited education or less . . . and have no past relevant work experience . . . we will find you disabled.
> . . .

Plaintiff fits none of these circumstances. He has a better-than-high-school education, and his past relevant work was at the medium exertional level and quite skilled. Additionally, those skills were found to be transferable to light and even sedentary work.

The undersigned therefore finds substantial evidence supports the ALJ's determination that Plaintiff did not meet the requirements of the "worn out worker exception" § 404.1562.

### F. Severe Impairments as of December 31, 2002, Plaintiff's Date Last Insured

The undersigned has chosen to address Plaintiff's first, most persuasive argument last. Plaintiff argues that "the evidence reflect[s] that on or before December 31, 2002, his date last insured: (1) the plaintiff had a 'severe' impairment; and (2) that he was not capable of performing any more than a range of light work from a physical standpoint." The "severity" test under 20 CFR § 404.1520(c), is that quoted by Plaintiff:

14

> If you do not have any impairment or combination of impairments <u>which significantly limits your physical or mental ability to do basic work activities</u>, we will find that you do not have a severe impairments and are, therefore, not disabled . . ..

(Emphasis added). Further, 20 CFR § 404.1521(a) provides:

> An impairment or combination of impairments is not severe if it does not <u>significantly limit your physical or mental ability to do basic work activities</u>.

(Emphasis added).

The Fourth Circuit held that "only those abnormalities which are "slight" could be called "nonsevere." See Evans v. Heckler, 734 F.2d 1012(4th Cir. 1984), in which the Fourth Circuit held:

> [A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

(Emphasis in original).

In this regard, the ALJ found as follows:

> Medical records, covering the period from November 1999 to February 2003, from Dr. A. Shetty, the only records in evidence for the period prior to and including the claimant's date last insured, December 31, 2002, show that while hypertension and diabetes mellitus had been diagnosed during the relevant time period, those conditions were not then severe. In fact, the majority of Dr. Shetty's progress notes document either simple acute conditions, which resolved with treatment without residuals, or simple check-ups, such as for his Commercial Driver's Licence (hereafter, "CD"), during which the claimant reported that he was "doing well."

(R. 15). The undersigned's review of the record up to and including Plaintiff's date last insured supports the ALJ's determination. The ALJ next discussed Dr. Shetty's own letter, which was written on March 20, 2006, at the request of Plaintiff's counsel, responding to the question of Plaintiff's health as of December 31, 2002. The letter provides as follows:

> As far as your questions are concerned, he was at that time, doing OK as far as his health was concerned. He did have diabetes and hypercholesterolemia, which does result in what happened to him now, which is his coronary artery bypass surgery

15

> times two. <u>In the meantime, as far as December, 02 is concerned in answering the physical residual functional capacity for that time, if you look at my notes, he was in good shape at that time. As far as his impairment, he did not have any.</u> As of now, he is positive for all employment. He can barely function in every day life. He cannot take care of himself, and basically needs someone else to take care of him, making sure that he is disabled and could use Social Security disability at this time.

(R. 133)(Emphasis added). Clearly, Plaintiff's own treating physician found that, although Plaintiff had medically-determinable conditions, as far as a physical residual capacity for that time, <u>he had no impairments.</u> This opinion is significantly supported by the doctor's notes, as the doctor himself said it would be. The ALJ found this opinion well-supported by the medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. He therefore properly gave Dr. Shetty's March 20, 2006, opinion controlling weight.

The Administrative Hearing was set for May 15, 2007. At the hearing, the ALJ specifically inquired about the above letter, noting that the Plaintiff's own treating physician opined that he had <u>no impairments</u> and was "ok" at the time his insurance expired. Plaintiff's counsel, however, submitted a new letter from Dr. Shetty at the hearing, written on May 3, 2007, almost one year after the first letter. When asked why he did so, counsel stated: "There's another letter after that [the March 2006 letter] because I asked him, you know, I told him doing okay or doing fine, that doesn't really provide the judge with an opinion . . . ." (R. 192). The second letter provides as follows:

> As far as your questions are concerned, he was at that time, doing OK as far as his health was concerned but I would limit his physical capabilities to no more than light work, or exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: the constant stress and strain of maintaining a production rate

pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.[3]

As of now, he is positive for all employment. He can barely function in every day life. He cannot take care of himself, and basically needs someone else to take care of him, making sure that he is disabled and could use Social Security disability at this time.

The significance of the second letter, to both the ALJ and to the undersigned, is that it no longer includes the statement specifically addressing Plaintiff's RFC in December 2002 as "as far as his impairment, he doesn't have any," and replaces it with what is a verbatim definition of the "light" exertional level from the Dictionary of Occupational Titles.

At the Administrative Hearing, the ALJ read the second letter and stated:

ALJ: He [Dr. Shetty] doesn't say what it's based upon. He's stating on one spot that his health is okay and then he gives him a limited RFC.

Counsel: Well I think he referred back to his office notes because he was treating him for, and it's reflecting his office records, diabetes - -

---

[3] Compare the foregoing paragraph with the definition of Light Work as contained in the Dictionary of Occupational Titles, which provides:

> Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

ALJ: And his diabetes at the time, as I recall reading in here was under control by medication. He had no peripheral type of neuropathy, had no retinopathy, so the diabetes was under control. I will give that report what weight I think it deserves (R. 193).

The second letter from Dr. Shetty fails for several reasons: First, Dr. Shetty gives no explanation for his change from "no impairments" a year earlier (yet closer in time to the actual DLI) and his requirement of a "light" exertional level a year later (based, apparently on the same evidence). Neither his own office notes nor the other evidence of record support his change to a "light" exertional level. Finally, and perhaps dispositively, Dr. Shetty's specific RFC is an opinion on an issue reserved to the Commissioner. See §404.1527(e)(2) and (3), which provide:

> (2) We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as . . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.
>
> (3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section.

The undersigned finds substantial evidence supports the ALJ's determination that Dr. Shetty's opinion of March 2006 was entitled to controlling weight. The undersigned therefore also finds that substantial evidence supports the ALJ's determination that Plaintiff had no severe impairments as of his date last insured, December 31, 2002.[4]

---

[4] Although not necessary to this Decision, the undersigned again notes that even had Plaintiff been limited to light work on December 31, 2002, this would not have disqualified him from all work, as counsel argued. At the administrative hearing held in May 2007, the VE testified that Plaintiff's past work as a motor inspector/repairperson in the electrical department would be classified as at the medium exertional level and would be considered skilled, with an SVP of 7 or 8 (R. 216). The skills would be transferable to jobs at lesser exertional levels, even down to light and sedentary levels. Dr. Shetty did not find any nonexertional or exertional impairments that would lessen Plaintiff's ability to perform the full range of exertional work at those levels.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's opinion that Plaintiff was not disabled at any time up to December 31, 2002, his date last insured.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's applications for SSI and DIB. I accordingly recommend Defendant's Motion for Summary Judgment [D.E. 16] be **GRANTED**, Plaintiff's Motion for Summary Judgment, or in the Alternative Remand [D.E. 13] be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to United States District Judge Frederick P. Stamp. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _10_ day of November, 2008.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE